I want to thank you, before we begin, for serving under the Criminal Justice Act. Thank you. Much appreciated. It's an honor to do so, Your Honor. I represent Paul Kramer, father and spouser in the courtroom sitting behind me. This was a 12-day trial in Polk County before District Court Judge Grichner. Our defense in this case was not a complex defense. The document-intensive case, that's not a dispute. Our defense was basically a defense that Mr. Kramer was distracted by the four bouts of cancer that his wife had suffered as he had developed to being a successful mortgage banker. Our other defense was good faith. And as you know, we did get an instruction at the end of the trial related to that good faith defense. The problem in this case was the fact we never had a full opportunity to present the good faith defense. And Judge Beam, I learned from the Mullenbrook case in an offer of proof, when I was arguing that case, make a more detailed record, which we did in this case. I cannot imagine a more detailed record made with regard to an offer of proof that we made to show our good faith in this case. I know you were also the judge on the Herbst case, which is perhaps the case that best analogizes what happened in this case. Obviously, that case was affirmed. However, in this case, we believe the evidence clearly showed that Mr. Kramer should have gotten the evidence in about the litigation. Let me point out why I believe that's the case. In the page five of the ruling that Judge Grichner made, he even concedes that there was a dispute between what Mr. Baker was doing with regard to Mr. Kramer and what Mr. Whelan came in later to do with regard to Mr. Kramer's law. If that's the case and the civil lawsuit contradicts that, it's material to the testimony that Mr. Kramer needed to go into to be able to establish with the jurors and with the other witnesses that what Mr. Whelan was saying he was doing contradicted what the lawsuit action said he was doing. Now, Judge Grichner said, I'm going to stop this for two reasons, he said. The first reason I'm going to stop it is because it's confusing. While the government was allowed to establish the contractual relationship, their own witness, FBI agent Kohler, said that the relationship between the borrower, this was their financial expert, and the banker is germane to this case. We told the jury in our opening statement and tried to establish through the course of this trial that Mr. Kramer's relationship with this banker was ever changing. It's an evolution. We asked the simple question, well, did you negotiate prior to the time of this litigation? The government objected it was sustained. Well, if the negotiations were still ongoing and the government was able to establish down the road that this disconnect happened and all of this activity that Mr. Kramer was engaged in was simply fraudulent, why then can't Mr. Kramer be given his constitutional right to be able to establish that his relationship with the bank and his interaction with Mr. Whelan and Mr. Baker was in good faith? Two other factors come into play. Mr. Baker clearly understood that this was his first case where he dealt with the mortgage bank. As a matter of fact, in 2004, it was Mr. Baker who sought out Mr. Kramer because U.S. Bank didn't have a relationship of any significance in the mortgage industry. And it was booming. So U.S. Bank sought Mr. Kramer out to engage in with him in this business and became his partner, lending him $4 million and then increasing the loan. When Mr. Whelan came in, it was his first time, also it was Mr. Baker's first time ever dealing with a mortgage banker and U.S. Bank was trying to expand in this area, but also when Mr. Whelan came in, remember he had no training, he had no idea how to close out this account and he was totally unaware of what Mr. Baker was doing with regard to this account. Mr. Kramer's good faith argument is that look, these folks came to me, they were working out this relationship with me and I can show you a judge through this evidence that in point of fact, I was operating just as they agreed to have me operate. Judge Gritzner sees this, but yet he decides that we can't get our good faith defense in. So really we were cut off at the knees with regard to being present. Judge Gritzner said two things and you're addressing somewhat of these two. One of them is he said, I don't want to try two trials. And that's typical for a judge to say is I only want to try one lawsuit at a time. And then the second part was that there was only, I can't remember the term they used, maybe it's barely relevant, because these events were occurring in I think 2006 to 9 and the events on trial were 2010 and 11. That's when the litigation was going on. I did a chronology chart and the chronology chart supports our position that all of this was going on at about the same time. They started recruiting him in 2004. The litigation started in 2010. All of this was interacting at the same time. When Judge Gritzner says, well, he didn't want to take too much more time, look at the time the government had to present their case and look at the time Mr. Kramer had to present his case. And oftentimes with the defendant, they get the short end of the stick in situations like this. So we didn't take, matter of fact, we took a lot less time presenting our defense than most of the other parties involved in this case. Ours was simple. It was good faith. Let us talk about what we understood. Was this a warehouse loan? If it was a warehouse loan, then it operated in a certain fashion. It gave the jury some idea that he didn't have to pay off every house the moment that he got the money in. That's not a very complicated defense, but he wouldn't let us even present that aspect of it. I have not looked at the record, but what were you proposing to Judge Gritzner in the way of witnesses and time? Very short. We could have finished this in two hours. Whelan was on the stand. Mr. Whelan was on the stand at the time. We laid out each and everything we needed to introduce, that he contradicted himself with regard to his testimony and whether this was a warehouse loan. They tried to call it a hybrid loan, a warehouse loan, a revolving credit loan. All of those operated differently and caused the mortgage banker to operate differently in responding to that. So we said, let us ask Whelan about his negotiations. The government had already introduced evidence establishing that Mr. Whelan and Mr. Kramer had negotiated all the way up until almost the time of the litigation. And that was the issue of the Holla property that came into question. We wanted to show that during these negotiations, when they were doing the foreclosure action, Mr. Kramer was continuing to operate, sending emails back and forth. And prior to the litigation and after the litigation, they were still negotiating on resolving this. If that doesn't go to his good faith, what does? That's the question that has to be posed. And how much time, if the government takes what, seven, eight days to present their case? We don't have nine hours to present our defense? Did you have this discussion with Judge Grichner? Absolutely. Matter of fact, we had a very lengthy discussion. As I said, it's not an inside joke when I tell Judge Beam the last time he brought this up. He said, you always make a pretty extensive record. The record was extensive. Not only was the record extensive in the colloquy between Judge Grichner and myself. We went back that night and worked up a very detailed offer of proof that specifically pointed out each and every area we wanted to go into. And we asked him again to allow us to do that. Because I don't know how else in a case like this you do the second tier of your defense, such as good faith, which would cut across the fabric of the entire case. Because if you can establish that Mr. Kramer and Mr. Whelan and Mr. Baker had this working relationship going back and forth, and it continued all the way up through the litigation, which all the records support, then a jury could understand that he was operating in a fashion that was reasonable under the circumstances, that demonstrated his good faith, and also showed that somehow he could have been distracted and not paying total attention to the matter. It would be a mistake. It wouldn't be intentional. It wouldn't be in bad faith. So those are the simple factors we wanted to establish. Two hours of time when the government, and you can tell from the record how much time they had, which was substantially higher. It doesn't fall in the category of the other two cases. The Herbst case doesn't fall in that category because it's a little bit different. And then they talk about the litigation. I believe it's the Colston case. I may not miss the case, but it's where this deposition of this person was taken. And in the deposition they allowed that person to answer a question because it went to credibility, but they would not allow the lawsuit to be brought in simply because she'd never read the lawsuit. But the lawsuit that we were talking about is one that Mr. Whelan not only initiated, he was familiar with it, and it contradicted his testimony. There was no necessity to go into a great deal and retry the civil case, and I'm not sure, Judge Riley, that that was his main objection because there is substantial colloquy in the case between Judge Grissman and myself saying why we thought it was important under these circumstances to lay this out. I think my time might be up for what I'd like to reserve for rebuttal. Certainly. Are there some other questions? Thank you, Your Honor. Thank you, Mr. Parrish. Mr. Keller, good morning. Good morning, Your Honors. May it please the Court, Mr. Parrish. The offer of proof that Mr. Parrish put before the Court on the issue of the civil litigation basically sought four categories of evidence that he wanted to admit. One, the negotiations between Kramer and U.S. Bank leading up to the civil judgment and then even after the civil judgment. Two, the fact that there were no allegations of fraud in the civil complaint. Three, that there were no default notices issued to Mr. Kramer until Mr. Whelan took over the relationship fairly late in the offense. And then four, that there was no mention of this warehouse line of credit in the civil litigation, but rather they sued him under a revolving note account. The negotiation with U.S. Bank during the civil litigation and after the civil litigation is not relevant to what Mr. Kramer's intent was years prior to that when he was committing the offense. If you portrayed the relationship differently in the civil case, I mean, if the bank portrayed the relationship different in the civil case than you portrayed it in the criminal case, wouldn't that be relevant? So the issue in the offer of proof that comes closest to meeting the relevancy requirement is the issue about warehouse line of credit versus revolving note account. What's the difference? What are the facets of a warehouse arrangement that are different from the revolving credit that seems important in this case? I think that is the critical question. There was nothing in the offer of proof that suggested at paragraph B on page 3 of the civil complaint, U.S. Bank described its relationship with Kramer as X. Mr. Wieland during the criminal trial has testified that U.S. Bank's relationship with Kramer was Y. These two things are contradictory. The only thing in the offer of proof was there's no mention of warehouse line of credit in the civil litigation. Instead, there's mention of revolving note account. Without some context for that, that's not material. That doesn't mean anything without explaining what those two terms mean. Well, if you have a warehouse line of credit, I don't know what this is for sure, but does that mean that you have a warehouse full of money and the bank is interested in security for that cash of money which the operator that they were dealing with could use as he or she saw fit or the company saw fit to make loans and they were interested in overall security on this cash of money rather than overall security on individual loans? Is that the nature of that beast? I believe based on the trial record that the defendant's position was a warehouse line of credit is a short-term credit agreement in which the security is pledged and the loan has to be paid off in a relatively short period of time, 30 days, 60 days, something of that manner. So it's a fairly strict credit agreement where the loan has to be repaid fairly quickly. As opposed to a revolving fund? As opposed to a revolving note account, which I understand the defense's position was a revolving note account is more like just a blanket credit agreement. Here's $4 million or $4.25 million. You owe us the balance in a year. You pay it off however you see fit. So there's more flexibility with the borrower into the revolving thing. And which scenario did you present, warehouse or revolving fund or neither? Well, under in Volume 7 and Volume 8 of the trial transcript in both Mr. Baker and Mr. Whelan's testimonies, they both described the relationship with Kramer as being something that was similar to a warehouse line of credit but did not exactly operate like a warehouse line of credit. Mr. Baker's testimony was that almost verbatim. And his point was that the contractual documents here with Mr. Kramer, this credit agreement had been crafted with Mr. Kramer. This is testimony in the criminal trial, right? Yes. What was your testimony in the civil trial? There's nothing about that in the record. That's my point. In the offer of proof, there's nothing about deposition testimony. There's nothing about allegations, factual allegations in the complaint that contradict the trial testimony at the criminal trial. There's – all we have in the offer of proof is revolving note account. They sued him on a revolving note account. Without any underlying facts or without any definition of what that term meant to U.S. Bank in that civil lawsuit, it's not relevant to the criminal trial. What was relevant to the criminal trial is what were the contractual documents that govern this agreement? What was Mr. Kramer's understanding of the agreement? What was the bank's understanding of the agreement? And did he act in accordance with the agreement? You're saying that there was no evidence in the civil trial that shed any light on that. Is that right? Nothing in the record, Your Honor. I haven't seen the civil complaint. The civil complaint wasn't offered in the offer of proof. It's not part of the criminal record. No depositions. Again, no – I don't believe there was a trial in the civil context. And so we have no facts for the judge to – What do you mean the offer of proof is not part of the criminal record? If a lawyer makes an offer of proof on an issue of evidence in the criminal trial, that's in the criminal record. Of course, Your Honor. What I mean to say is when Mr. Parrish made his offer of proof, he did not cite any specific evidence from the civil case that we can rely on at this point to judge what was U.S. Bank saying in the civil case that contradicted what they said in the criminal case. We don't know because there's nothing – that information was not presented in the offer of proof. When you mean we, you mean you and Judge Gritzner. Correct, Your Honor, or the court and myself at this point. I mean even judging the record on appeal, all we have is the record, and it's impossible to judge from this record what were the details of the civil lawsuit that contradicted the details of the testimony other than, well, in the civil lawsuit they categorized the relationship as a revolving note account, and here they've categorized it more as a warehouse line of credit, which isn't even accurate. Mr. Parrish cross-examined Mr. Baker extensively on this point, and Mr. Baker said, I said that it operated like a warehouse line of credit. Not that it was specifically under a term of art definition a warehouse line of credit, but it operated similar to. He's talking in generalities. The specifics of the agreement were governed by the contractual documents between Mr. Kramer and the bank, and those contractual documents were presented to the jury. So, you know, a difference between two general classifications in two different contexts is not by itself relevant. There was testimony that a revolving note account and a warehouse line of credit have overlapping features, that there was reference to this hybrid concept, that the relationship with Mr. Kramer was kind of a hybrid relationship, and so a bare reference to, well, here they called it revolving note account, and here it's been said that it operates similar to a warehouse line of credit, that may not even be inconsistent, and at that point it's not relevant. The other things that were sought to be presented in the offer of proof, in addition to the fact that, for example, the negotiations don't go to the defendant's state of mind at the time of the offense, the post-offense negotiations don't shed any light on what he thought at the time of the offense, and the fact that there were no allegations of fraud in the civil suit is not relevant to the criminal fraud case. They didn't need to allege fraud in the civil suit to obtain civil recovery, so the fact that they chose not to plead those allegations is not relevant to the criminal case. The fact that there were no default notices issued until Whelan took over the account, that was presented to the jury through Whelan's testimony. He was cross-examined about that by Mr. Parrish. It was also presented to the jury through Mr. Baker's testimony. The fact is that a lot of the evidence sought to be presented in the offer of proof had been presented to the jury through the cross-examination of Mr. Baker and Mr. Whelan and through the direct examination of Mr. Kramer in his own defense and through the direct examination of Mr. Baker, who was recalled in the defense case. And so Judge Grittson was clearly within his discretion to say, this evidence either has already come in or it's only marginally relevant and we have 403 problems here, and so I'm going to exclude this evidence. It wasn't like Mr. Kramer was precluded in his entirety from presenting his defense. He got a good-faith defense instruction. He took the stand and presented the exact arguments that Mr. Parrish is arguing here and that he was arguing were the basis for the facts that he wanted to get in in the offer of proof, and Mr. Parrish argued that good-faith defense, the ambiguity of the credit relationship, the lack of default notices, the difference in how Mr. Baker handled the relationship versus how Mr. Whelan handled it, Mr. Parrish argued all of that in closing argument. So he wasn't precluded from presenting his good-faith defense. Judge Gritzner exercised his gatekeeping function in limiting the evidence of the good-faith defense in the context of this civil lawsuit, but that was for good reason in the context of a 12- or 13-day trial where he's concerned about confusing the jury as to what the civil liability might be versus criminal liability. That was certainly a decision that . . . Well, Mr. Parrish makes a somewhat compelling argument to say, well, you had so many days to present your case, and then he goes to put on his case, and the judge says, well, you know, we're dragging this case out. I don't want to drag it out anymore. And so the defense is . . . the judge shortens the defense after the government has put on a lengthy case. What's your response to that? Your Honor, the judge . . . First of all, this initially came up in cross-examination of one of the government's witnesses, and Mr. Parrish had been cross-examining both Mr. Baker and Mr. Whelan at length, I believe for over an hour, for each witness. It's not like the majority of his cross-examination was cut off by the judge, and the judge didn't even say at that point, I'm worried that you're wasting our time. The judge said that I think there's serious relevancy problems, and I think we have problems with confusion of the jury. So it wasn't like the judge was just arbitrarily saying, this trial has been going for 12 days. We're not going to listen to any more evidence at this point. The judge was saying, I don't think this evidence is relevant. If it is marginally relevant, I'm concerned about confusing the jury under 403. His primary reason for excluding the evidence was not undue delay. Well, I just had a question about the restitution. And in the briefing, there's an argument related to particular properties that were identified by the government, perhaps listed in an exhibit, and it's contended that there's a problem with those, that they were not, those properties were not related to the alleged fraudulent acts, or that there was, it was a problem in using those particular properties as evidence in the restitution case. And I wondered if you would speak to that. How did those properties tie in to the determination of restitution? Yes, Your Honor. The case, the relationship between Kramer and U.S. Bank involved dozens of properties. Some of those properties were legitimately paid off to U.S. Bank when Mr. Kramer was paid off. A lot of those properties were not paid off to U.S. Bank when Mr. Kramer was paid off. So the restitution exhibit listed the legitimate properties that U.S. Bank had been paid off on at the time of sentencing, at the time of criminal sentencing. Those properties were not the properties involved in the fraud. By definition, they were the legitimate transactions where U.S. Bank had received the property, still had clear title to the property, and was able to sell it and receive proceeds. So the argument that the properties listed in the restitution exhibit weren't part of the fraud states the obvious. The properties that were the basis of the bank's recovery were the legitimate properties that the bank received from Mr. Kramer. The loss was caused by all the illegitimate properties that Mr. Kramer never paid the bank off on or that Mr. Kramer sold out from under U.S. Bank after he had pledged them. And so those were the properties where the bank is left absorbing the loss. But that wasn't the purpose of the restitution exhibit. The purpose of the restitution exhibit was to show, okay, this is the initial loss the bank starts with. These are all the legitimate properties that the bank was able to sell. And that takes you down to a final loss amount of about $2.38 million. Now there was reference in the exhibit to some properties that Mr. Kramer had specifically alleged in reciprocal discovery that he took the position that he should have been credited for those properties as well. And the bank listed those properties and explained why they didn't receive proceeds on those and why those should not be subtracted from the initial loss amount. And many of those properties were properties that had been sold out from under the bank and were involved in the fraud. I believe my time has expired. I have a question, though, before you. Was the restitution property in the criminal case fully encompassed within the civil judgment? In other words, is this the same properties that the value of the property involved in the civil judgment is the same as the property in the restitution, this criminal restitution? Yes, Your Honor. The civil judgment that we start with for the loss amount of $3.78 million was an amount of principle only that Kramer owed to the bank based solely on properties that were involved in transactions in this credit agreement between the bank and Mr. Kramer that was the subject of this trial, that was the subject of also the civil litigation. There were no outside properties from some parallel relationship that they had with Mr. Kramer that were involved in the civil litigation. Well, since they were already adjudicated in the civil action, what was the purpose of seeking restitution then in the criminal case? And doesn't that lend some credibility to Mr. Parrish's argument that he was somewhat limited in this interchange between the two pieces of litigation? As to the first question, Mr. Kramer pledged significant additional properties to U.S. Bank once the relationship crumbled. Once U.S. Bank realized that they were under collateralized, that they didn't have title to all the properties they thought they had title to, Mr. Kramer pledged a significant number of additional properties to try to address the lack of collateral. So at the time of the civil judgment, U.S. Bank was still in possession of many of those properties. By the time of the criminal sentencing, they had sold many of those properties that had been additionally pledged. And so the criminal restitution, we had to show what their true loss was after they had been able to sell all of the additional properties that Mr. Kramer had pledged. So in that sense, it was – the initial civil judgment was properly reduced by the properties they had sold, and then you get a much lower number for the criminal restitution. With regard to how that affects his – impacts the argument that he should be able to present evidence about those negotiations in trial, the restitution and the loss were not at issue at trial. He was able to present evidence about those things at the restitution hearing, at the sentencing hearing. And so I don't think that the fact that they were at issue in terms of restitution means that that evidence was relevant at trial. Okay. Thank you. Ms. Rudolph, how much time does Mr. Parrish have? He has four minutes. Okay. Mr. Parrish? Not blaming Mr. Keller. He was at a disadvantage. This was a complicated case. He was not the trial lawyer. And you really – to get the tenor in the field of being cut off at the knees after you try a case in your defense is good faith, and the judge stops you. The judge knew what the lawsuit was. We all knew the author of proof specifically addresses that, and perhaps not being there gives you a little bit of a disadvantage in being able to present it to this court. But he says, did you sue for this debt as a warehouse line of credit? Objection. Relevance. Sustained. How did you sue for this debt to collect? Same objection. Sustained. Were you involved in negotiations to file the lawsuit? Same objection. Sustained. Then the colloquy starts. Well, we're not going to get our good faith defense in this way because the lawsuit shows that he objects, and Judge Beam, it's directly on point. Mr. Kramer's defense was that he could sell property, any house, bring it in, pay these people $22,000 a month, which he paid, bring them all in under what Baker said was a hybrid note. They contradicted each other. Even Judge Gritzner finally at the ruling talks about the contradiction. If a jury can never understand that relationship and the importance of what Mr. Kramer was thinking each time that he met with these folks, well, you don't have to turn this house payment over. You just keep paying your monthly payment. We'll keep giving you that $50,000 personal note that you can draw on at any time. It makes a difference to a jury. What does this evidence of the prior civil case add that you didn't get in anyway through your own witnesses presenting your defense? I assume they got up and explained the same thing. They did not. He wouldn't let them. He stopped it. Well, I mean, without reference to the prior case, I assume your client's people got up and explained their understanding of what the arrangement was. My client could understand it, but if they are saying that his conduct was such that was inappropriate, you need witnesses who were actually doing the work, who knew the contract. As Mr. Keller just argued, the contract was something that they laid out and was the base of this arrangement. Well, it was clear that Mr. Baker changed the arrangement. It was clear that Mr. Baker said it was a hybrid note. It was clear that Mr. Whelan said, I don't know how it was operating. Why is that not relevant to good faith when a banker who's never been in trouble, who all of his witnesses says has high character, how all of a sudden the dealing with the bank, he becomes a thief or a crook. As someone who's robbing Peter to pay Paul, if he doesn't have the defense of good faith to show, this is how the bank came to me and operated with me, and I can put Mr. Whelan on and say, Mr. Whelan, when this lawsuit was filed and you were involved in the negotiation, isn't it true that you didn't know what type of loan operation it was, that he didn't have to turn every house payment over? And the point is, Judge O'Reilly, that was the critical issue, that he did not have to turn every payment over. You couldn't get that through any other witnesses except through U.S. bank personnel. Now, Mr. Whelan, who was actually handling the account, or Mr. Baker, those are the people who you need to get it. The government had been able to establish it in their case that was based upon the core of the relationship. Their expert, Agent Kohler, was able to testify that the relationship between the banker and the borrower is extremely important. So why can't we, in our cross-examination, follow up to establish that he did everything he was supposed to do to be in compliance? That's the problem. We were cut off at the knees. He never had his good faith defense, and consequently, we are here today asking this court to reverse this case and send it back. Thank you. Thank you, Mr. Parrish. We will, first of all, thank you for your arguments. Well done, and we'll take it under advisement and be back to you in due course. Thank you.